UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAURA HOLLIDAY,

               Plaintiff,                                                    Hon. Janet T. Neff

v.                                                              Case No. 1:18-cv-1299

COMMISSIONER OF SOCIAL
SECURITY,

               Defendant.

_____/

## REPORT AND RECOMMENDATION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act.   Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of Social Security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process.   *See Willbanks v. Secretary of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988).   The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal

standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Secretary of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989). The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Secretary of Department of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Secretary of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984). As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## BACKGROUND

Plaintiff was 50 years of age on her alleged disability onset date.   (PageID.285).

She successfully completed high school and worked previously as a baker helper, cashier, sales

clerk, hand packager, and stock clerk.   (PageID.57-58).   Plaintiff applied for benefits on March

25, 2015, alleging that she had been disabled since November 7, 2013, due to: (1) post-traumatic

stress disorder (PTSD); (2) neck injury; (3) dyslexia; (4) hearing loss; (5) hip pain; (6) vericose

veins; and (7) memory loss.   (PageID.285-92, 323).

Plaintiff's applications were denied, after which time she requested a hearing before

an Administrative Law Judge (ALJ).   (PageID.132-283).   Following an administrative hearing,

ALJ Sarah Zimmerman, in an opinion dated March 16, 2018, determined that Plaintiff was not

disabled.   (PageID.45-59, 66-110).   The Appeals Council declined to review the ALJ's

determination, rendering it the Commissioner's final decision in the matter.   (PageID.31-35).

Plaintiff subsequently initiated this action pursuant to 42 U.S.C. § 405(g), seeking judicial review

of the ALJ's decision.

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for

evaluating disability.   *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[1]   If the Commissioner can

---

[1] 1.   An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b), 416.920(b));

2.   An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. §§ 404.1520(c), 416.920(c));

3.   If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors. (20 C.F.R. §§ 404.1520(d), 416.920(d));

4.   If an individual is capable of performing her past relevant work, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e), 416.920(e));

make a dispositive finding at any point in the review, no further finding is required.   *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).   The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity.   *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy.   *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.   While the burden of proof shifts to the Commissioner at step five of the sequential evaluation process, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined.   *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Commissioner of Social Security*, 127 F.3d 525, 528 (6th Cir. 1997).

The ALJ determined that Plaintiff suffers from: (1) degenerative disc disease of the lumbar spine; (2) degenerative joint disease of the bilateral hips; (3) migraines; (4) obesity; (5) hearing loss; (6) major depressive disorder; (7) post-traumatic stress disorder (PTSD); and (8) personality disorder, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1.   (PageID.48-50).

---

5.   If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f), 416.920(f)).

With respect to Plaintiff's residual functional capacity (RFC), the ALJ determined that Plaintiff retained the ability to perform light work subject to the following limitations: (1) she can lift/carry 20 pounds occasionally and 10 pounds frequently; (2) during an 8-hour workday, she can stand/walk for sit for 8 hours and stand/walk for 6 hours; (3) she can occasionally stoop, kneel, crouch, and crawl, but can never climb ladders, ropes, or scaffolds; (4) she can hear at moderate noise levels; (5) she can carry out simple instructions; (6) she can occasionally interact with the public; and (7) she can tolerate occasional changes in a routine work setting.   (PageID.50).

A vocational expert testified that given this RFC, Plaintiff would still be able to perform her past relevant as a baker helper and hand packager.   (PageID.102-05).   The vocational expert also testified that there existed more than 500,000 other jobs in the national economy which Plaintiff could perform despite her limitations.   (PageID.102-05).   Based on this testimony, the ALJ found that Plaintiff was not disabled because (1) she was still capable of performing past relevant work and (2) there exists a significant number of jobs exist in the national economy which Plaintiff can perform, her limitations notwithstanding.   Accordingly, the ALJ concluded that Plaintiff was not entitled to benefits.

I.      **Medical Evidence**

In addition to Plaintiff's testimony at the administrative hearing, the administrative record contains copies of medical treatment records and statements by Plaintiff.   The ALJ described this evidence as follows:

> In July 2013, she began treating with physiatrist Christina Richardson, D.O., for hip and back pain. At that time, she was taking Neurontin, Flexeril, and Norco (B3F/19). Dr. Richardson noted that the claimant ambulated with a slight antalgic gait (B3F/19). However, she demonstrated good joint stability, full strength, good range of motion in all extremities, and intact

-5-

sensation (B3F/20). She referred the claimant to physical therapy (B3F/20).

After undergoing physical therapy for her hip, the claimant reported that she felt more mobile than she had in a long time (B3F/31). When she returned to Dr. Richardson in August 2013, she again demonstrated normal range of motion, strength, and sensation. She moved freely (B3F/l 7). Dr. Richardson instructed the claimant to continue in her home exercise program for continued improvement (B3F/15-16).

In March 2014, the claimant's primary care physician referred the claimant back to Dr. Richardson for renewed complaints of back and neck pain (B1F/39; B3F/13). The claimant told Dr. Richardson that she was still performing her home exercise program. However, she was unable to recall some of the exercises in her program. Dr. Richardson observed that the claimant tended to hold her trunk in a stable position without allowing any range of motion through the trunk. She stated that this posture was contributing to some of the claimant's dysfunction. She referred the claimant back to physical therapy to learn her home exercise program (B3F/14).

Due to reported problems with her mental health and insurance, she did not begin physical therapy until August 2014 (B3F/9, 11). She attended therapy for approximately one month between August 2014 and September 2014 (B2F). In October 2014, she told Dr. Richardson that she stopped physical therapy when one session caused increased back pain (B2F/7). However, her therapist's notes show that the claimant reported increased back pain caused by running (B2F/50). Subsequently, she stopped attending therapy (B2F/55). Regardless, the claimant reported that physical therapy had been helpful overall (B3F/7).

In November 2014, the claimant obtained an MRI of her lumbar spine that showed minor grade I anterolisthesis of L5 on S1. There were mild multilevel degenerative changes with minimal L4-L5 spinal canal narrowing and mild multilevel neural foraminal narrowing (B1F/58).

In December 2014, the claimant began getting injections with Stephen Andriese, M.D. He administered a caudal epidural steroid injection in December 2014 due to low back pain that radiated to her left leg (B3F/5). When she returned over two months later, the claimant reported that the injection had been

very helpful for leg pain. However, she continued complaining of back pain. Therefore, Dr. Andriese administered a bilateral lumbar facet joint injection (B3F/3). The claimant reported getting good relief with that injection (B3F/l).

The claimant did not return to Dr. Andriese until January 2016. During the interim, she used lidocaine patches, Diclofenac, Neurontin, and Flexeril prescribed by her primary care provider (B7F). The claimant's primary care provider also referred the claimant for another course of physical therapy. The claimant reported that her medication and physical therapy were both very helpful for back and hip pain (B7F/16). A September 2015 x-ray study of her hips showed mild arthritic changes (B8F/2). Her provider stopped her use of lidocaine patches around October 2015 due to briefly elevated liver enzymes (B7F/16). The provider referred the claimant to an orthopedic specialist for alleged hip pain. However, the claimant never followed-up on the recommendation (B7F/19).

In April 2016, the claimant began treating with a new primary care physician. However, she continued taking Flexeril, Neurontin, and Diclofenac for pain (B13F). Dr. Andriese administered an injection for the claimant's left hip pain in May 2017 (B18F/3). She also attended another course of physical therapy in July 2017 (B17F). Dr. Andriese administered relief (B18F/2).

The claimant also has migraines. She initially used over-the-counter pain relief as needed for her headaches (B1F/34). In January 2016, she returned to Dr. Andriese complaining of neck pain that caused headaches. She estimated that she had three migraines every month (B6F/3). Dr. Andriese administered occipital nerve blocks that nearly eliminated her headaches (B6F/1-3). In early March 2016, she told her primary care provider that she had experienced just two migraines since receiving the nerve blocks (B7F/1). She did not require repeat occipital nerve blocks until March 2017 (B18F/4).

The claimant has bilateral hearing loss generally corrected with hearing aids. She has used bilateral hearing aids since childhood (B1F/48). In January 2015, she acknowledged that she did not always use the hearing aids (B4F/38). Consultative examiner Michael Simpson, M.D., noted in July 2015 that the claimant was able to hear conversational speech without limitation while  she wore the aids (B5F/3). Around January 2016, she obtained new

hearing aids (B7F/6). The prior ALJ identified this impairment as non-severe (B1A/7). However, the claimant testified that she becomes confused due to the background noise she hears with her hearing aids. Thus the undersigned finds that the claimant can hear at moderate, as opposed to loud or very loud, noise levels.

The claimant is five feet and six inches tall and has weight ranging from approximately 183 to 210 pounds for a Body Mass Index between 29.5 and 33.9 (B3F; B16F/4). The claimant is clinically obese. The undersigned has considered how weight affects the claimant's ability to perform routine movement and necessary physical activity within the work environment. The undersigned is aware that obesity is a risk factor that increases an individual's chances of developing impairments in most body systems. Obesity can cause limitation of function and the effects of obesity may not be obvious. The combined effects of obesity with other impairments may be greater than might be expected without the disorder. The undersigned has considered any added or accumulative effects the claimant's obesity played on her ability to function, and to perform routine movement and necessary physical activity within the work environment.

The claimant has major depressive disorder, posttraumatic stress disorder (PTSD), and personality disorder (B9F/30). She underwent counseling with therapist Bridget Klaasen at Northern Lakes Community Mental Health (CMH) between August 2013 and March 2014. The claimant initially presented to appointments expressing anger and frustration with CMH. However, the claimant acknowledged that she was capable of presenting well in social situations and she stopped being confrontational when engaged in conversation (B4F/8-10). Ms. Klaasen noted that the claimant appeared to use hostility to test other people (B4F/12). The claimant began group therapy at CMH in October 2013. However, the therapist asked her to discontinue that service because she was minimally engaged in treatment and frequently did not attend therapy (B4F/14-25). In March 2014, the claimant presented as smiling and friendly, which Ms. Klaasen noted was different from her usual presentation at group therapy. The claimant reported that she was doing well. She described having many responsibilities with her grandchildren. She also reported that she had reconnected with an old friend (B4F/28).

The claimant did not return to CMH until January 2015. At that time, she underwent an initial assessment with Ms. Klaasen. The

claimant reported that she could manage her symptoms on a daily basis. However, when her symptoms escalated, she could become very angry. She believed that her childhood trauma caused her current issues (B4F/42). The claimant reported feelings of hopelessness, helplessness, and worthlessness. She stated that she had difficulty sleeping and had poor energy and concentration (B4F/41). Ms. Klaasen noted that the claimant tended to put pressure on all of her relationships by setting unattainable standards for others to meet her emotional needs (B4F/30, 37). For example, Ms. Klaasen said the claimant tended to quit counseling and failed to respond to follow-up letters sent by CMH. Yet she viewed the facility and other institutions as abandoning her (B4F/37). Regardless, the claimant reported that she was caring for her grandchildren, cleaning her daughter's home, and preparing meals for her family. On weekends, she visited her ex-spouse (B4F/38).

After the claimant restarted therapy, she acknowledged that her mood improved and that she was better at coping with her anger (B4F/33). The claimant continued seeking attention from others by sending accusatory messages through Facebook. However, she reported improvement by exhibiting fewer anger outbursts (B10F/14). Around April 2015, the claimant's mood improved drastically when she formed a new relationship. The claimant generally denied having problems with anger and she was able to utilize her conflict resolution skills (B10F/1-13). The claimant stopped attending CMH in December 2015 when she moved from her daughter's home. After she moved, she told her primary care provider that she was very happy with her new living situation. She stated that she felt less anxious and more energetic (B7F/6).

In June 2016, the claimant began treating through the Central Wellness Network. She presented to psychiatrist Jennifer Palamara, M.D., in June 2016. The claimant acknowledged that her problems had been occurring her entire life. She stated that her symptoms increased 12 years prior (B9F/26). At that time, the claimant was living with a friend. She reported that she was cleaning up their home. She also reported making wood art, sketching, and working in a garden. She reported that she sold some of her crafts (B9F/26). The claimant stated that she was volunteering at a food pantry and meeting new people through a church (B9F/26). The claimant reported that she had been taking Zoloft for ten years and that her anger outbursts were better on that medication. The claimant stated that she experienced hyper-

-9-

vigilance, nightmares, and flashbacks related to past abuse (B9F/26).

Dr. Palamara prescribed Prazosin. However, the claimant stopped taking it after three days due to side effects. In July 2016, the claimant acknowledged that she could walk away when she became angry. She was still making and selling crafts (B9F/10). The claimant reported feeling hopeless. She stated that she had difficulty sleeping and concentrating (B9F/19). Dr. Palamara started her on a trial of Belsomra for sleep (B9F/22). However, when the claimant returned in September 2016, she reported that she had actually started to cut down on her medication because she was tired of taking pills. She stated that she believed her problem with focus  was due to taking Neurontin (B9F/13). Dr. Palamara started her on Ritalin for focus (B9F/16). Three weeks later, the claimant returned reporting that she was now able to sit and focus all day on her art. However, she continued exhibiting her very negative thought processes (B9F/7-10).

Subsequently, the claimant continued on the same dose of Zoloft and Ritalin. She continued reporting improvement in mood, focus, nightmares, and flashbacks (Bl2F/l 8034). The claimant also attended counseling with another therapist between September 2016 and April 2017. The  claimant frequently reported engaging in a wide range of activities such as spending time with family, creating art, engaging in photography, gardening, and preparing to display her art at shows (B12F/1-31).

(PageID.51-55).

## II.        The ALJ Properly Evaluated the Opinion Evidence

### A.     Dr. Jennifer Palamara

On November 16, 2016, Dr. Palamara completed a form regarding Plaintiff's emotional impairments and limitations.  (PageID.712-17).  The ALJ, however, afforded "little weight" to the doctor's statements.   Plaintiff argues that she is entitled to relief on the ground that the ALJ failed to afford "appropriate weight" to Dr. Palamara's opinion.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, give controlling weight to the opinion of a treating source if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Secretary of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citation omitted). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Ibid.* (citation omitted). Simply stating that the physician's opinions "are not well-supported by any objective

-11-

findings and are inconsistent with other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment.   *Id.* at 376-77.

      If the ALJ affords less than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to be afforded such.   *Id.* at 376.   In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors.   *Ibid.* (citing 20 C.F.R. § 404.1527).   While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to his assessment.   *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).

      Dr. Palamara assessed Plaintiff's abilities in various "aptitudes."   With respect to Plaintiff's "mental abilities and aptitudes needed to do unskilled work," the doctor rated Plaintiff's abilities in sixteen separate areas.   The doctor reported that Plaintiff possessed "no useful ability to function" in eight areas, was "unable to meet competitive standards" in four areas, was "seriously limited" in two areas, and was "limited but satisfactory" in two areas.   (PageID.714).

      With respect to Plaintiff's "mental abilities and aptitudes needed to do semiskilled and skilled work," the doctor rated Plaintiff's abilities in four separate areas.   The doctor reported that Plaintiff possessed "no useful ability to function" in two areas and was "unable to meet competitive standards" in two areas.   (PageID.715).   With respect to Plaintiff's "mental abilities and aptitude needed to do particular types of jobs," the doctor rated Plaintiff's abilities in five

separate areas.    The doctor reported that Plaintiff possessed "no useful ability to function" in one area, was "unable to meet competitive standards" in one area, was "seriously limited" in one area, and was "limited but satisfactory" in one area.   (PageID.715).   The doctor did not indicate whether Plaintiff could "use public transportation."   (PageID.715).   The doctor also reported that Plaintiff would be absent from work "more than four days per month."   (PageID.716).

In support of her decision to afford little weight to Dr. Palamara's opinion, the ALJ stated:

> Her opinion is internally inconsistent. She stated that the claimant could manage her benefits in her own best interest and she assigned the claimant a GAF score of 60 (B9F/1, 6). This portion of her opinion is inconsistent with the remainder of her opinion identifying extreme limitations in most areas of mental functioning. Her opinion is also inconsistent with her treatment of the claimant. Dr. Palamara regularly continued the claimant on her regular medication without noting any need for change. Further, the claimant's wide range of activities already discussed show that she is able to function at a higher level than Dr. Palamara identified. Therefore, the undersigned accords this opinion little weight beyond what is reflected in the above residual functional capacity.

(PageID.56).

The ALJ's rationale is supported by substantial evidence as Dr. Palamara's contemporaneous treatment notes reveal.   (PageID.718-42).   The ALJ's decision in this regard must be affirmed for an even more fundamental reason, namely the form that Dr. Palamara completed does not constitute a "medical opinion" to which deference must be accorded.   *See* 20 C.F.R. §§ 404.1527(a)(2); 416.927(a)(2) (a medical opinion is defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions"); *see also*,

-13-

*Ashley v. Commissioner of Social Security*, 2014 WL 1052357 at *7-8 (W.D. Mich., Mar. 19, 2014).   Simply checking a box on a pre-printed form indicating that an individual is, for example, "unable to meet competitive standards" or is "seriously limited" in a particular area fails to indicate what the individual can still do despite their impairments.   Accordingly, such does not constitute an opinion to which any deference must be accorded.   The same conclusion applies to the doctor's assertion that Plaintiff would be absent from work more than four days per month.   Such is not supported by the evidence and, again, does not even constitute a medical opinion to which deference must be accorded.   *See, e.g., Ellis v. Commissioner of Social Security*, 2016 WL 3735776 at *4 (W.D. Mich., July 13, 2016) (a doctor's "predictions of how often Plaintiff would likely miss work was conjecture, not a medical opinion").   Accordingly, this argument is rejected.

B.    Melissa Crysler

On April 27, 2015, Plaintiff's daughter, Melissa Crysler, completed a report regarding Plaintiff's daily activities.   (PageID.365-71).   The ALJ described Crysler's opinion as well as her reasons for discounting such as follows:

> The claimant's daughter Melissa Crysler completed a third-party function report on her behalf in April 2015. She alleged that many symptoms prevented the claimant from working. She stated that the claimant has constant pain and limited mobility in her neck, hip, and back. She stated that the claimant had problems with memory, understanding, hearing loss, and comprehension (B6E/8). She stated that the claimant had limitations in the areas of lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, climbing stairs, remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others. She estimated the [claimant] could walk for 20 minutes and pay attention for five minutes (B6E/13). She stated that the claimant was like a 12-year old girl mentally (B6E/15). Ms. Crysler submitted another statement in September 2017 indicating that she had asked her mother to leave her home because of her anger

-14-

outbursts, mood irregularity, and lack of common sense. She attributed the claimant's problems to her childhood trauma (Bl8E/l-2). Ms. Crysler's opinion is inconsistent with her decision to allow the claimant to babysit her 16-month old child (B6E/9). The record shows that the claimant has some limitations in some of the areas she identified. However, the record also shows that the claimant's treatment significantly improved her symptoms-as long as she remained compliant. The record does not show that the claimant's symptoms were as intense or as frequent as Ms. Crysler indicated. Therefore, the undersigned accords this opinion little weight.

(PageID.56-57).

Plaintiff argues that she is entitled to relief because "having known the Claimant her entire life, she is in the best position to make comments on Claimant's medical and mental conditions and how they affect the Claimant's quality of life."   While Crysler undoubtedly has known Plaintiff her entire life, there is no evidence that Crysler is a medical or mental health professional or otherwise possesses training and/or experience which elevate her opinions beyond lay status.   The ALJ credited Crysler's statements to the extent they were supported by the medical evidence.   The Court discerns no error in the ALJ's treatment of such.   *See, e.g., Mullins v. Commissioner of Social Security*, 2015 WL 3441163 at *13 (E.D. Mich., May 28, 2015) ("the ALJ is not required to give any perceptible weight to lay opinion testimony that does not comport with the medical evidence").   Accordingly, this argument is rejected.

## **CONCLUSION**

For the reasons stated herein, the undersigned recommends that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice.   28 U.S.C. § 636(b)(1)(C).

-15-

Failure to file objections within such time waives the right to appeal the District Court's order.

*See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: October 4, 2019                     /s/ Ellen S. Carmody
                                          ELLEN S. CARMODY
                                          United States Magistrate Judge

-16-